47 F.3d 1176
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terrell AMERS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Genevieve AMERS, Defendant-Appellant.
 Nos. 93-50806, 93-50807.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 6, 1994.
Decided Feb. 13, 1995.
 
 Before: SCHROEDER, FLETCHER and THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Terrell Amers and his wife Genevieve appeal their sentences. Both pleaded guilty to conspiracy and structuring financial transactions. In addition, Terrell pleaded guilty to theft from a program receiving federal funds and money laundering. The Amerses contend the district court erred by (1) ordering Terrell to serve his prison term concurrently with his undischarged term of imprisonment, because the result is a partially consecutive sentence allegedly in violation of Sec. 5G1.3 of the United States Sentencing Guidelines (the guidelines); and (2) estimating the tax loss resulting from the conspiracy in calculating Genevieve's base offense level under Sec. 2T1.1 of the guidelines.
 
 
 3
 We vacate Terrell's sentence and remand for further findings and resentencing by the district court. We affirm Genevieve's sentence.
 
 FACTS
 
 4
 During the 1980s, the Amerses were members of the Los Angeles County Sheriff's Department. In 1987, Terrell joined an elite narcotics enforcement team, the Major Violators Crew II (Majors II). The mission of Majors II was to investigate money laundering and narcotics.
 
 
 5
 While a member of Majors II, Terrell conspired with fellow deputies to skim a portion of the money seized from criminals. To conceal the source of his take, Terrell, along with Genevieve, devised a money-laundering and tax evasion scheme. They made numerous small cash bank deposits, bought luxury items with cash, structured their deposits into new bank accounts, and bought money orders and cashier's checks. Genevieve conducted the majority of the Amerses' financial transactions, paying their monthly bills and making most cash deposits.
 
 
 6
 In 1989, a task force began investigating the Majors II team. As a result of a sting operation, members of Majors II, including Terrell, were indicted in United States v. Amers, CR 90-111(A)-ER. Terrell was charged with conspiracy to commit theft, six counts of theft, one count of tax fraud, one count of extortion and one count of money laundering. After a jury trial, Terrell was convicted of conspiracy, one count of theft relating to the sting, and tax fraud. He was sentenced to 48 months in prison.
 
 
 7
 The government later learned that Terrell's involvement was more extensive than originally thought. Cooperating deputies said Terrell stole or received stolen money in connection with at least 18 cases. This led to Terrell and Genevieve being indicted in the present case on new charges. Terrell pleaded guilty to all of the new charges, and Genevieve pleaded guilty to two.
 
 
 8
 Genevieve was sentenced to 21 months imprisonment. Terrell was sentenced to 41 months, to run concurrently from the date of sentencing with his earlier 48-month sentence, for which he had already served 31 months.
 
 DISCUSSION
 A. Standard of Review
 
 9
 We review for clear error the factual findings underlying the district court's application of the guidelines. United States v. Chapnick, 963 F.2d 224, 226 (9th Cir.1992). We review the district court's interpretation and application of the guidelines de novo. United States v. Ogbuehi, 18 F.3d 807, 814 (9th Cir.1994).
 
 B. Terrell's Sentence
 
 10
 Section 5G1.3 of the guidelines provides a methodology for sentencing a defendant who is subject to an undischarged term of imprisonment:
 
 
 11
 (a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.
 
 
 12
 (b) If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment.
 
 
 13
 (c) (Policy Statement) In any other case, the sentence for the instant offense shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense.
 
 USSG Sec. 5G1.3[1]
 
 14
 The background note to Sec. 5G1.3 explains:
 
 
 15
 Except in the cases in which subsection (a) applies, this guideline is intended to result in an appropriate incremental punishment for the instant offense that most nearly approximates the sentence that would have been imposed had all the sentences been imposed at the same time.
 
 
 16
 Both the government and the Amerses agree subsection (a) is inapplicable. Although it is unclear from the record, the parties assume the district court applied subsection (b), rather than (c), in sentencing Terrell.
 
 
 17
 Whichever section the district court relied on in crafting Terrell's sentence, the record is insufficient for us to determine the methodology by which the sentence was imposed. We cannot tell whether the district court found that all or some or none of Terrell's present offenses were taken into account in the prior sentencing.
 
 
 18
 If all of the present offenses were taken into consideration when the court determined Terrell's offense level in the first case, then according to subsection (b) Terrell's sentence in the present case should have been ordered to run concurrently with his entire sentence in the earlier case, not just the unserved portion of it.[2]
 
 
 19
 Because the district court imposed a partially consecutive sentence, it seems most likely the court decided that all of the present offenses were not fully taken into account in determining Terrell's offense level when the first sentence was imposed. If this is so, then Terrell should have been sentenced under subsection (c), with the court imposing a consecutive sentence "to the extent necessary to achieve a reasonable incremental punishment for the instant offense." USSG Sec. 5G1.3(c).
 
 
 20
 In order to determine a reasonable incremental punishment for the instant offense, the court should have determined "the sentence that most nearly approximates the sentence that would have been imposed had all the sentences been imposed at the same time." USSG Sec. 5G1.3, comment (backg'd). The district court should then have determined what portion of this hypothetical combined sentence was imposed when Terrell was sentenced in the first case, and what consecutive sentence it should impose to yield "a reasonable incremental punishment for the instant offense." USSG Sec. 5G1.3(c).
 
 
 21
 Because the district court did not make findings from which we can tell how it computed and imposed its partially consecutive sentence, we must vacate Terrell's sentence and remand for further findings and resentencing. See 18 U.S.C. Secs. 3553, 3584 (requiring district court to explain reasons for imposing a particular sentence); United States v. Conkins, 9 F.3d 1377, 1385 (9th Cir.1993) (remanding for district court to explain why it imposed a consecutive rather than a concurrent sentence); cf. United States v. Redman, 35 F.3d 437, 441 (9th Cir.1994) (holding the district court did not misapply Sec. 5G1.3(c) by imposing a consecutive sentence on a defendant already subject to an undischarged prison term when the court considered the relevant guidelines methodology and justified using an alternative method).
 
 
 22
 On remand, if the district court concludes some incremental consecutive sentence should be imposed, it should determine the overall sentence that would most nearly approximate the total sentence had the sentence in the first case and the sentence in the second case been imposed at the same time. It can then determine what, if any, consecutive sentence should be imposed "to achieve a reasonable incremental punishment for the instant offense." USSG Sec. 5G1.3(c).
 
 C. Genevieve's Sentence
 
 23
 Genevieve contends she was incorrectly sentenced because the district court miscalculated the tax loss which resulted from her offenses under Sec. 2T1.1(c)(1)(A) of the guidelines. The court calculated the tax loss using $296,000, the total amount stolen by Terrell, as the baseline figure. Genevieve contends the court should have used $109,000, the amount listed in Count 1 (conspiracy to evade taxes), to which she pleaded guilty. All other counts, except Count 15 (structuring financial transactions to avoid IRS transaction reporting requirements) to which she also pleaded guilty, were dismissed pursuant to the plea agreement. We reject this argument.
 
 
 24
 Section 1B1.3 provides that the base level offense level shall be determined on the basis of the following:
 
 
 25
 (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
 
 
 26
 (B) in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.
 
 
 27
 Contrary to Genevieve's assertions, the district court properly considered the entire $296,000 of Terrell's thefts in computing her base offense level. According to the district court's findings, Genevieve knew the entire $296,000 had been stolen. This finding is not clearly erroneous.[3]
 
 
 28
 The fact that Genevieve was charged with knowledge of the entire scheme did not deprive her of the benefit of the plea agreement. There was no agreement regarding the amount of the taxloss in the plea agreement or what, if any relevant conduct would be considered at sentencing. Genevieve received the full benefit of the bargain--a substantially reduced base offense level.
 
 
 29
 VACATED and REMANDED in part, and AFFIRMED in part.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 All references are to guidelines sections in the 1993 version of the United States Sentencing Commission Guidelines Manual
 
 
 [2]
 As oral argument revealed, it is unclear whether the phrase "the undischarged term of imprisonment" as used in subsection (b) requires that the subsequent sentence should run from the beginning of the term of imprisonment of the original sentence or from the remaining unserved portion of the sentence. However, the ambiguity is resolved when subsection (b) is interpreted in light of application note 2--the only guidelines note applicable to subsection (b). According to this guidelines note, subsection (b) requires that credit be given for time already served with the subsequent sentence being "imposed to run concurrently with the remainder of the defendant's [undischarged] sentence." USSG Sec. 5G1.3 commentary, n. 2 (emphasis added); accord United States v. Redman, 35 F.3d 437, 438-39 (9th Cir.1994) (interpreting subsection (b) as requiring "mandatory concurrent sentences")
 
 
 [3]
 The presentence report noted that:
 [Genevieve Amers] admitted that her husband provided her money and told her to deposit it into their account. This account is the same account [she] has used for years. She explained that she did have some suspicions as to "where did Terry get the money." She advised that she should have questioned him, but instead felt it was money that Terry had from other investments prior to their marriage. She explained that Terry would handle the cash and she would deposit the cash into their account.... She further explained that she was in charge of the monthly expenses. She advised that a majority of their bills were paid with funds provided by her husband. She explained that although she was the only one who actually paid the bills, both she and Terrell always knew their financial situation and were aware of each other's expenditures. [Genevieve] claimed that they never discussed where the additional money came from and that Terrell never told her about it.
 Presentence Report, p 30 (Nov. 9, 1993); see also id. at p 16.
 Relying on the presentence report, see Government's Excerpt of Record at 82 ("I'm going to accept the recommendations of the probation department in regard to Mrs. Genevieve Amers. I find ... there's nothing of a material nature contained in the report that is inaccurate or incorrect."), the district court concluded:
 [Genevieve Amers] says she does not know what the source of the funds is. The improbability of that statement being true is of such a high order that the court has to reject it. I think she knew what Mr. Amers was doing. I think she participated with him.
 Id. at 84.